**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **FREDDIE SAMS,** : | |
| : | |
| Plaintiff, : | Case No. 2:19-cv-5330 |
| : | |
| v. : | Chief Judge Algenon L. Marbley |
| : | |
| **FRANKLIN COUNTY, OHIO, et al.,** : | Magistrate Judge Chelsey M. Vascura |
| : | |
| : | |
| Defendants. : | |

**OPINION AND ORDER**

This matter is before this Court on Defendants' Motions for Summary Judgment. (ECF Nos. 104, 106). For the reasons that follow, Defendants' Motions are **GRANTED**.

## I. BACKGROUND

### A. Factual Background

Following a domestic altercation on November 18, 2017, Mr. Freddie Sams presented to the Emergency Department at Mount Carmel East Hospital with a "very very small" stab wound on his left arm and pain in his right hand. (ECF No. 115 at 17-18). The Emergency Department x-rayed his right hand and identified a fracture to the third metacarpal bone. (*Id.* at 19). Mr. Sams was placed in a "volar splint" and discharged, with various instructions "to follow up with orthopedics in 5-7 days," "[c]all for an Appointment in 5-7 days," and "follow-up as needed." (*Id.*). He was also prescribed an antibiotic for the stab wound and provided with wound care instructions. (*Id.* at 24, 30). Tylenol and Advil were to be taken as needed for fever or pain, respectively. (*Id.* at 23, 30-31). Mr. Sams had contacted the police to lodge a complaint about the assault, but police officers arrived at the hospital and placed him under arrest for domestic violence. (*Id.* at 19).

1

Upon arrival at the jail, medical staff assessed Mr. Sams, during which they noted that he had a "cast" on his right arm and a stab wound. (ECF No. 107-1 at 28). Medical staff acknowledged receipt of the Mount Carmel paperwork that indicated that Mr. Sams should contact orthopedics in five to seven days. (*Id.*). The same injuries were noted during Mr. Sams's classification interview the following day. (ECF No. 107-2 at 67).

With respect to Mr. Sams's stab wound, on November 19, the day after Mr. Sams's arrival, a non-defendant doctor at the jail ordered that wound care should be completed once a day. (ECF No. 104-1). On November 20, records indicate that a non-defendant nurse was unable to complete wound care because Mr. Sams was out of the facility. (ECF No. 107-3 at 18). Between November 21 and November 29, Defendant Nurses Levering and Sumo assert that they performed wound care and medication administration for Mr. Sams daily, with a few exceptions when wound care was performed by non-defendant nurses. Mr. Sams alleges, however, that the last time he received wound care was on November 27. Indeed, medical records from the jail indicate that "wound care" was "Administered" by Defendant Nurse Sumo on November 27, but the entry on November 29 indicates "Other" and "Patient up to see PA on 11-30-17." (ECF No. 107-3 at 18). On November 30, the physician assistant ordered that Mr. Sams should receive wound care only once a week. (ECF No. 104-1). On December 7, when Defendant Nurse New-Berry attempted to complete Mr. Sams's wound care, no correctional officers were available to escort her to Mr. Sams's cell, as required by facility policy. (ECF No. 107-1 at 30). She reported her inability to perform the care to Defendant Nurse Flores. (*Id.*).

With respect to Mr. Sams's fracture, on November 23, five days after admission to the jail, Mr. Sams submitted a sick call request explaining that he had not been "sent to my doctor to have

my cast put on and the hospital said 10 days." (ECF No. 103-3 at 53). He indicated that he "would like to file a grievance form as soon as possible so I can see a specialist." (*Id.*). The next day, on November 24, Mr. Sams was evaluated by a non-defendant nurse practitioner. Mr. Sams indicated that his soft cast was beginning to smell, and the nurse practitioner removed it, cleansing the area with soap and water and rewrapping it with an ACE bandage to stabilize the hand and forearm. (ECF No. 107-1 at 28). She also evaluated whether Mr. Sams's capillaries in his fingers refilled at an appropriate rate when pressed, and noted that his third, fourth, and fifth fingers were "deviating to the right" and that swelling was present. (*Id.*). During this evaluation, Mr. Sams expressed concern that he had not yet been seen by an orthopedist. (*Id.*). The nurse practitioner's notes reflect that she explained to Mr. Sams that "embolizing the fracture" with the "hard splint" is treatment, and that "fractures take 6-8 weeks to heal." (*Id.* at 29). That same day, Mr. Sams submitted another sick call request, again indicating that he had not seen a specialist yet, "which was ordered 10 days ago by the hospital." (*Id.* at 62).

A few days later, on November 27, Mr. Sams filed another sick call slip, indicating that he believed he was experiencing medical neglect and that "Nurse Elizabeth" and "Nurse [Deddeh]," presumably Defendants Levering or Flores and Sumo, "purposely" lied to him about having a broken finger when he has a broken hand. (ECF No. 103-3 at 78). Mr. Sams also explained in the sick call form that he believed Nurse Elizabeth lied again by telling him, in front of Nurse Deddeh and three deputies, that he knew about the December 1 doctor's appointment. (*Id.*). Mr. Sams concluded from this exchange that Nurse Elizabeth "cancelled" his appointment. (*Id.*).

Mr. Sams submitted an "Inmate Call Card" on November 29, which was labeled in several places as a "GRIEVANCE" and addressed to "Major," presumably Defendant Turner, the facility commander. (*Id.* at 65). Mr. Sams explains that his "main issue" is his broken hand, "which has

3

not been addressed properly by a professional doctor." "I've written several complaints to your staff with no results, but a re-wrap to my hand. I was ordered by a Mount Carmel East medical doctor to have a cast on my hand within 7-10 days but your medical staff ignores that order." (*Id.*). He also notes that he requested several grievance forms, but has not been given any. (*Id.*). Mr. Sams received a response to his call card later that day: "you are scheduled to go to a dr. but that info will not be given to you for security reasons. The Physician Asst. here will see you tomorrow." (*Id.* at 65). The bulk of the response author's last name is unintelligible, but it is at least clear that the response was signed by a "Sgt. M." Mr. Sams has named a "Sgt. Jay Muncy" as Defendant. But Defendant Taylor denies that a "Sgt. Jay Muncy" has worked at the facility during his tenure there. (ECF No. 106-1 at 1).

On November 30, Mr. Sams met with a non-defendant physician assistant. She also removed Mr. Sams's splint, noting "mild edema" and "mild deformation of the 4th metacarpal and tenderness to palpation." (ECF No. 107-3 at 28-29). The physician assistant also noted, however, that Mr. Sams was able to move his fingers and that his capillaries still refilled briskly. (*Id.*). She molded Mr. Sams a new volar splint. (*Id.*). Mr. Sams's stab wound appeared to her to be healing well. (*Id.*). Records indicate that staff marked the task of contacting the Mount Carmel orthopedics department as "completed" on November 30, twelve days after Mr. Sams was assessed at Mount Carmel. (*Id.* at 16). The recommended orthopedic follow-up appointment was scheduled for December 13.

Mr. Sams submitted two more sick call request forms, on December 2 and December 4. A nurse responded to the second of those requests on December 5, noting that "follow up ortho appt scheduled. 12/13/17. Per NP note splint in place." (ECF No. 103-3 at 63).

4

That same day, on December 5, an x-ray was performed on Mr. Sams's hand. (ECF No. 107-3 at 87). It revealed that his right third metacarpal remained fractured. (*Id.*).

The domestic violence charges against Mr. Sams were eventually dismissed, and he was released from the facility on December 12. During his deposition, Mr. Sams initially asserted that he had seen an orthopedic specialist on December 13, as scheduled. (See ECF No. 107 at 92). But in the absence of any records regarding that appointment, and upon further questioning, Mr. Sams indicated that he was not sure what day he saw a doctor after his release. (*Id.*). What is clear, however, is that Mr. Sams reported to the emergency room on January 4, 2018, twenty-three days after his release from jail, for continued hand pain. (ECF No. 107-2 at 16). There, he was diagnosed with a "closed displaced fracture of other part of third metacarpal bone of right hand with delayed healing." (*Id.*). In his right hand, he exhibited "decreased range of motion, tenderness, bony tenderness, deformity and swelling." (*Id.* at 18). On January 9, he visited the emergency room again, and was again diagnosed with a "closed fracture of right hand with delayed healing." (ECF No. 107-2 at 40).

Mr. Sams also visited an orthopedic specialist to whom he was referred, Dr. Timothy Iorio, on January 15. Dr. Iorio noted some "localized edema at the third metacarpal," in addition to "[m]oderate tenderness to palpation." (ECF No. 104-6 at 2). He also observed that Mr. Sams had full range of motion. (*Id.*). Dr. Iorio reviewed the x-ray taken of Mr. Sams on January 4 at the emergency room, and concluded that Mr. Sams had a "nondisplaced, comminuted third metacarpal neck/head fracture" that appeared "subacute." (*Id.*). In other words, there was "evidence of healing." (*Id.*). Dr. Iorio opted to "discontinue splint immobilization" and "initiate buddy tape." (*Id.*). He ordered that Mr. Sams follow up in 4 weeks with x-rays to be taken prior to the visit. (*Id.*).

In his Complaint, Mr. Sams alleges that "Defendants refusal to change bandages, casts, attend to his wounds and medically treat [his] injuries caused [him] disfigurement, infection and loss of use of his fingers/wrists, and hand." (ECF No. 65 at 5-6). But in April 2018, Mr. Sams followed up with the orthopedic specialist's office, and was evaluated by a nurse practitioner. She noted that his fracture was "well-healed" and that the paresthesia he was experiencing was "likely not related to fracture healing/plan of care." (ECF No. 103-2 at 81). Mr. Sams was later diagnosed with "mild right-sided carpal tunnel syndrome" in July 2018. (ECF No. 107-21). Plaintiff points to no evidence of continued issues with his left arm wound.

### B. Procedural Background

Mr. Sams initiated this suit on December 4, 2019. He initially brought claims against Franklin County; the Franklin County Sheriff's Department; NaphCare, Inc., which provides medical care at the jail; and unidentified John and Jane Does. (ECF No. 1). In 2020, this Court dismissed the claims against Franklin County and the Franklin County Sheriff's Department with prejudice. (ECF Nos. 41, 42, and 43). Mr. Sams filed a Second Amended Complaint in March 2021, naming present Defendants in their official and individual capacities, in addition to NaphCare Inc. (ECF No. 65). This Court granted Defendants' subsequently filed Motions to Dismiss with respect to NaphCare and the claims against Defendants in their official capacities; only the claims against Defendants in their individual capacities remain. (ECF No. 80). The Defendant Nurses—Levering, Sumo, New-Berry, and Flores—and the Defendant Officers—Turner and Muncy—each filed a Motion for Summary Judgment. (ECF Nos. 104, 106). Those Motions are now ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact[,] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716-17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the non-moving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249-50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (finding that after the burden shifts, the non-movant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009).

### III.   LAW & ANALYSIS

Mr. Sams claims that both sets of defendants were indifferent to a serious risk of harm such that they violated his constitutional rights. The Eighth Amendment protects convicted prisoners from "cruel and unusual punishments." *Lawler v. Hardeman County, Tennessee*, 93 F.4th 919, 926 (6th Cir. 2024). Prisoners' claims for insufficient medical care sound in the Eighth Amendment and contain an objective and subjective component. *Id.* at 926. The objective component "requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Constitution." *Helphenstine v. Lewis County, Kentucky*, 60 F.4th 305 (6th Cir. 2023) (quoting *Griffith v. Franklin Cnty.*, 975 F.3d 554, 567 (6th Cir. 2020)). The subjective component, on the other hand, "requires the plaintiff to show that a defendant 'knew of and disregarded an excessive risk to inmate health or safety.'" *Id.* (cleaned up) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 837 (1994)). The Due Process Clause of the Fourteenth Amendment affords pretrial detainees like Mr. Sams protections that "at least match those afforded convicted prisoners." *Lawler*, 93 F.4th at 926.

#### A.  Objective Component: Sufficiently Serious Medical Need

As mentioned above, the "objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate" the Constitution. *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). The Sixth Circuit "recognizes two distinct methods for establishing the objective component." *Anthony v. Swanson*, 701 Fed.App'x. 460, 463 (6th Cir. 2017). When a plaintiff had "a medical need diagnosed by a physician as mandating treatment," but the prison nonetheless failed to provide any treatment or provided treatment "so cursory as to amount to no treatment at all," the plaintiff has satisfied the objective prong. *Rhinehart*, 894 F.3d at 737 (internal quotation marks and citations omitted). This method applies when the medical

need is so obvious, even to a layman, that "the delay alone in providing medical care creates a substantial risk of harm." *Anthony*, 701 F.App'x at 463 (quoting *Blosser v. Gilbert*, 422 Fed. App'x 453, 460 (6th Cir. 2011)).

On the other hand, "if a medical need is less obvious, its seriousness is evaluated under a different standard: the effect of delay in treatment." *Id.* When asserting that the delay in treatment of a less obvious medical need violates the Constitution, a plaintiff must submit "verifying medical evidence to establish 'the detrimental effect of the delay in medical treatment.'" *Id.* (quoting *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013)). This is because "this Court lacks the requisite medical expertise to properly evaluate" whether such claims have merit. *Id.* at 464. The "effect of the delay" standard also applies to allegations that a prison failed to treat a plaintiff's condition adequately. *Id.*

Mr. Sams argues that his claim falls into the category of cases where seriousness is determined by the effect of delay in treatment. (ECF No. 114 at 8).[1] Although Mr. Sams at times appears to conflate the bandaging of the stab wound to his left arm and the wrapping of the fracture in his right hand, the Parties focus on the long-term medical effects of Mr. Sams's fracture. To

---

[1] Had Mr. Sams pursued the first route, he also would have been unsuccessful. "The obviousness standard does not apply in cases where prisoner" received some care, but "claims that the treatment he received was inadequate." *Anthony*, 701 F.App'x at at 464. Nor can it be argued that jail medical staff here provided such cursory care that it amounted to no treatment at all: Mr. Sams's healing was evaluated on several occasions and medical staff rewrapped his hand to provide support as he healed.

Even if the obviousness standard applied, the question is not whether a broken bone and a small stab wound present an obvious need for medical attention in the first instance. The question for Defendants' liability is whether Defendants were confronted with obvious, serious medical needs once his hand had already been evaluated, diagnosed, and set by an emergency room physician. Even though the discharge papers from Mount Carmel recommended that Mr. Sams follow-up with an orthopedist in five to seven days, prompt orthopedic follow-up for an already-set fracture does not strike this Court as so obvious a need that "the delay alone in providing medical care creates a substantial risk of harm." *Anthony*, 701 F.App'x at 463.

support his argument, Mr. Sams explains that when he was discharged from Mount Carmel prior to his incarceration, the discharge papers instructed him to "follow up with orthopedics in 5-7 days." And several weeks after he was released from the jail, Mr. Sams was evaluated by several doctors who concluded that his fracture exhibited "delayed healing." In Mr. Sams's view, this alone establishes a causal relationship between the care he received while incarcerated and the state of his hand several weeks after release.

Defendants point out, however, that Mr. Sams has failed to produce any medical expert or other evidence to connect the delayed orthopedics appointment to the delayed healing that Mr. Sams's doctors observed. *See Napier v. Madison Cnty., Ky.*, 283 F.3d 739, 743 (6th Cir. 2001) (affirming a grant of summary judgment because the plaintiff "ha[d] not offered any medical evidence to show that he suffered a detrimental effect from being kept from his scheduled dialysis" while incarcerated for twenty-nine hours). Of course, a delay in orthopedics treatment is one possible explanation for the delay in healing. But without a professional medical opinion explaining the available treatments for an already-set metacarpal fracture, the probable medical outcomes of that treatment, and "the detrimental effect, if any, of the alleged delay on those treatments and outcomes," no reasonable jury could conclude that the delay in ability to see an orthopedist necessarily caused Mr. Sams's prolonged healing process. *See Jackson v. Gibson*, Case No. 1:16-cv-993, 2018 WL 4566247, at *3 (S.D. Ohio Sep. 24, 2018) (Black, J.) (explaining that, with respect to a "sophisticated medical condition," these considerations are not known to laypeople). Although a broken bone is a relatively common ailment, with respect to Mr. Sams's specific fracture, "[t]hese issues are simply 'not within the realm of lay understanding.'" *Id.* Moreover, the orthopedic nurse practitioner that evaluated Mr. Sams in April 2018 concluded that

10

his fracture was "well-healed" and that the paresthesia he was experiencing was "likely not related to fracture healing/plan of care." (ECF No. 103-2 at 81).

To put it plainly, Mr. Sams has failed to show that an orthopedics appointment would have changed the course of his healing, particularly given that he received brace changes and an x-ray during his incarceration. Accordingly, he has not shown a genuine issue of material fact with respect to the objective component of the deliberate indifference analysis, and his claims against all Defendants must fail.

### B. Subjective Component: Recklessness

Given that Mr. Sams has not shown a genuine issue of material fact with respect to the objective component of his claim, this Court need not reach the Parties' remaining arguments. Nonetheless, this Court will briefly examine whether Mr. Sams has shown that any of the Defendants acted with requisite state of mind to support a deliberate indifference claim.

Traditionally, courts extended the standards for evaluating claims under the Eighth Amendment to claims by pretrial detainees under the Fourteenth Amendment. *Id.* at 927. But in *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021), the Sixth Circuit interpreted new Supreme Court excessive force precedent to require modification of "the subjective prong of the deliberate-indifference test for pretrial detainees." *Id.* According to *Brawner*, "[a] pretrial detainee must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* at 596. In other words, the defendant must have "acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine*, 60 F.4th at 315-16 (cleaned up). There has been some debate among Sixth Circuit panels about how to interpret *Brawner*, *see id.*, but ultimately, the court has "settled on a test that reduced *Farmer*'s subjective element from

11

'actual knowledge to recklessness,'" *Lawler*, 93 F.4th at 927 (quoting *Helphenstein*, 60 F.4th at 316).

Analysis of the subjective component proceeds defendant-by-defendant. With respect to the Defendant Nurses, Mr. Sams fails to create an issue of fact that any of them displayed recklessness. And if any of them displayed mere negligence, it was with respect to Mr. Sams's stab wound care, not his fracture.

Defendant Elizabeth Levering, LPN, asserts that her only interactions with Mr. Sams occurred when she provided his prescribed medications on November 21. (ECF No. 104 at 17). Likewise, Defendant Deddeh Sumo, LPN, performed wound care and administered medication to Mr. Sams almost every day between November 21 and November 27. On other days, non-defendant nurses administered his medication and wound care. Mr. Sams presents no evidence that this care was in any way reckless, or even negligent. Moreover, given that this Court understands the "wound care" Mr. Sams received to pertain to his left arm's stab wound, not his right hand's fracture, Mr. Sams puts forth no evidence that Defendants Levering and Sumo played any role in his fracture's "delayed healing."

Defendant Brooke New-Berry, LPN, was unable to perform Mr. Sams's ordered wound care on December 7 because no correctional officers were available to escort her to Mr. Sams's cell. Mr. Sams alleges that, as a result, his bandage was not changed between November 27 and his release on December 12. (ECF No. 114 at 11). It goes without saying that fourteen days is a long time to go without having a bandage changed. But it is not evident that this failing comes to rest with Defendant New-Berry personally. No one disputes that Defendant New-Berry was not permitted to attend to patients without an escort. She noted the issue in Mr. Sams's chart, explaining that she informed the charge nurse, Defendant Flores, that Mr. Sams's wound care

12

should be administered as soon as an escort became available. Her efforts to ensure Mr. Sams did indeed receive care hardly evince recklessness. And as with Defendants Levering and Sumo, there is no indication that the delay in changing Mr. Sumo's arm bandage in any way contributed to delayed healing of his right hand.

Defendant Elizabeth Flores, RN, asserts that her only relevance to this case is that Defendant New-Berry purportedly told her that Mr. Sams needed wound care as soon as an escort was available.[2] Since it does not appear that Defendant Flores or another nurse completed Mr. Sams's wound care as ordered, Mr. Sams might be able to show some negligence on Defendant Flores's part—perhaps she forgot to change the bandage herself, or forgot to ask someone else to do it; perhaps not. But negligence is not enough, even under the new, lower subjective standard set forth in *Brawner*. 14 F.4th at 596. And just as is the case with the other Defendant Nurses, no medical evidence has been presented that connects a failure to change Mr. Sams's arm bandage to his hand's delayed healing.

Turning now to the Defendant Officers, Defendant Mychal Turner, the facility commander, explains that he never had any personal interaction with Mr. Sams during his incarceration. (ECF No. 106-1 at 1). Mr. Sams acknowledged as much during his deposition. (ECF No. 107 at 130). Even though Defendant Turner oversees the facility's operations, "[a] supervisory defendant must be either personally involved in the constitutional violation or there must be a causal connection

---

[2] Neither Defendant Elizabeth Levering, nor her co-defendant, Elizabeth Flores, address the fact that one of them appears to be featured in one of Mr. Sams's sick call submissions, referred to there as "Nurse Elizabeth" and "the Nurse Practitioner." In that submission, Mr. Sams accused the nurse in question of lying to him and canceling a doctor's appointment scheduled for December 1. Given that Mr. Sams's narrative in the sick slip is difficult to parse—and it is unclear whether he refers to Levering, Flores, or another Elizabeth altogether—even if Mr. Sams had shown a serious medical need, he has failed to create a genuine issue of fact that either of the Defendants was in some way reckless.

between a supervisor's act and the alleged constitutional violation." *Anthony*, 701 Fed. App'x. at 464 n.2. That Mr. Sams addressed his "Inmate Call Card" to Major Turner does not move the needle: there is no evidence that Defendant Turner ever received the submission. Indeed, the evidence suggests the opposite: Defendant Turner explains that he did not receive the submission, (ECF No. 106-1 at 1), and the response was signed by a Sergeant. That Defendant Turner apparently did not receive the call card addressed to him may be an indictment of the grievance system but nonetheless prevents a reasonable jury from concluding that Defendant Turner "acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Brawner*, 14 F.4th at 596.

And finally, this Court turns to the elusive "Sgt. Jay Muncy," who Mr. Sams alleges signed the call card response that informed Mr. Sams that he was scheduled for an appointment with a doctor but explained that further details would not be provided for security reasons. The author also explained that Mr. Sams will see a physician assistant at the jail the following day. Even if this response exhibited recklessness, as opposed to providing helpful information, Defendant Turner explains that no one by the name of "Sergeant Jay Muncy" has worked at the facility during his tenure there. (ECF No. 106-1 at 1). Mr. Sams's insistence that the form clearly reads "Sgt. Muncy" (it does not) is of little help to him. Given the dearth of evidence that "Sgt. Muncy" behaved recklessly, or that he even exists, this Court would decline to allow claims against him to proceed, even if Mr. Sams had shown evidence of a serious medical need.

* * *

In sum, Mr. Sams has failed to present any evidence that any delay in scheduling his orthopedic specialist follow-up visit had any causal relationship to his fracture's delayed healing,

14

nor has he presented any evidence that Defendants exhibited the requisite subjective state of mind towards his medical needs.

### C. Qualified Immunity

The Defendant Officers argue that should this Court find they were deliberately indifferent to Mr. Sams's serious medical needs, they are nonetheless entitled to qualified immunity. (ECF No. 106 at 10-13). Because Mr. Sams has not shown that the Defendant Officers violated his constitutional rights, this court need not reach the issue.

### IV. CONCLUSION

For the reasons set forth above, this Court **GRANTS** Defendants' Motions for Summary Judgment. (ECF Nos. 104, 106). This case is hereby **DISMISSED**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE**

**DATE: July 2, 2024**